IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

A.G.                          :        CIVIL ACTION
                              :
        v.                    :
                              :
LOWER MERION SCHOOL DISTRICT  :        NO. 11-5025


MEMORANDUM

Bartle, J.                              September 28, 2012

        Plaintiff A.G. filed suit against Lower Merion School

District ("LMSD") for violations of § 504 of the Rehabilitation

Act, 29 U.S.C. § 794, and the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 et seq.[1]  The parties' cross-motions

for summary judgment are now before the court.[2]

                              I.

        Summary judgment is appropriate "if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323

---

1.  The complaint also named A.G.'s parents as plaintiffs on both
the Rehabilitation Act and ADA claims.  On December 20, 2011, the
court granted the motion of LMSD to dismiss A.G.'s parents as
plaintiffs for lack of standing.

2.  A.G. has not stated a claim for relief under the Individuals
with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et
seq.  Because A.G.'s claims do not arise under that statute, we
do not apply the "modified de novo review" that district courts
utilize when hearing a challenge to a state administrative
decision under that statute.  See Ridley Sch. Dist. v. M.R., 680
F.3d 260, 268 (3d Cir. 2012).

(1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).

A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable jury to find for the plaintiffs.  Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  We view the facts and draw all inferences in favor of the non-moving party.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

II.

There are no genuine disputes as to any material facts. A.G. is a self-described biracial female who attended elementary

-2-

school, middle school, and high school in LMSD.  In October 2001, when A.G. was in third grade, an unknown LMSD representative prepared a Comprehensive Evaluation Report that concluded A.G. required speech therapy to correct her pronunciation of certain consonant sounds.  The report stated that A.G.'s pronunciations of these sounds had been evaluated using the Arizona Articulation Proficiency Scale.  It also listed the specific consonant combinations A.G. pronounced inadequately.  This report was prepared using a standardized LMSD form that contained space for the evaluator to report the student's scores on the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III").  The person who prepared the report either did not administer the WISC-III to A.G. or did not record her scores.  This person also concluded that the sections of the form concerning "instructional evaluation reports," "ecological evaluation reports," "vocational technical education assessment results," "interests, preferences, aptitudes (for transition planning)," and "functional behavioral assessment results" were not applicable.  A.G.'s mother approved this report, and A.G. thereafter received speech therapy.  At LMSD, speech therapy was administered as part of the special education curriculum.

In June 2002, several persons, including A.G.'s teacher, Lorraine Tracy, and a reading specialist, Constance Major, prepared and submitted a "Referral Form" with respect to

A.G.'s academic performance.[3]  Specifically, Tracy stated that
she was making the referral because she wanted to know, "What
additional strategies would help [A.G.] to be a successful
learner?"  Tracy also desired to know whether A.G. was "achieving
at her capabilities."  She observed that A.G.'s "progress is
slower in reading, writing & math" and that she "has many more
inaccuracies in computation in Math assignments."  Tracy noted
that between December 2001 and February 2002, she had discussed
her concerns with A.G.'s mother.  Tracy recounted a December 2001
conference in which she told A.G.'s mother that A.G. would begin
working with Major, a reading specialist.  Tracy further
explained that in February 2002, she informed A.G.'s mother that
"there would be a Child Study Team meeting to discuss strategies
which might help [A.G.]"

The referral form set forth that during third grade
A.G. began participating in a program referred to as "Title I,"
which the parties describe as a remedial program for students who
need additional instruction in math or reading.  Major, the
reading specialist who oversaw LMSD's Title I program, made the
following notation on the referral form: "Title I Data 5/02:
PASP @ level 3 8.0-8.5 age level; read @ Grade 3 w/ 99%
comprehension."  Although Major was not deposed during discovery,

_____

3. Like the 2001 report, this 2002 referral was prepared using a
standardized form promulgated by the school district.  The report
contains several sections.  The sections of the referral were
completed by different LMSD employees and each employee signed
the section they completed.

LMSD school psychologist Santa Cucinotta testified that she did not know how Major arrived at the conclusion that A.G. had "99% comprehension" of third grade reading materials.[4]  Concerning A.G.'s reading, Tracy commented, "In small groups, she finds success since the level of reading is easier than the Third Grade anthology Literary Reader."

LMSD sought permission from A.G.'s parents to evaluate A.G. in order "to determine an appropriate educational program." The request advised A.G.'s parents that they would be part of the team evaluating their daughter's need for special education. A.G.'s mother granted LMSD permission to evaluate A.G.'s need for special education on August 7, 2002.

When LMSD requested permission to evaluate A.G., it provided A.G.'s parents with a Procedural Safeguards Notice. Generally, the Procedural Safeguards Notice explains the duties, protections, and remedies available to both parents and the school district when LMSD evaluates a student for special education, places a student into special education, or changes a student's special education curriculum.  The notice also explains the circumstances under which parents are entitled to written notice from LMSD and what facts that written notice must contain. In addition, the notice states that LMSD or a parent "may

_____

4. Cucinotta testified that the remark, "PASP @ level 3 8.0-8.5" referred to a standardized test for evaluating a student's ability to articulate certain phonological combinations.  A.G., age 9 at the time, scored as well as a child between age 8 years and age 8 years, 6 months.

initiate a hearing regarding the school district's/public agency
proposal or refusal to initiate or change the identification,
evaluation, or educational placement of the student or the
provision of a FAPE ["Free Appropriate Public Education]."[5]

        In November 2002, Cucinotta, the school psychologist,
began meeting with A.G., now in fourth grade, to evaluate her
abilities as a student.  As part of her evaluation, Cucinotta
administered the WISC-III to A.G.  This standardized examination
yielded numerous scores, only a few of which are relevant for
present purposes.  A.G.'s performance on the WISC-III resulted in
a "Verbal IQ" score of 108 (70th percentile), a "Performance IQ"
score of 81 (10th percentile), and a "Full Scale IQ" of 95 (37th
percentile).  Cucinotta explained the import of these scores as
follows:

> On this test of general intelligence, [A.G.]
> scored in the Average range and ranks at
> about the 37th percentile for children her
> age.  Her true Full Scale IQ is likely (90%)
> to fall in the range 89 to 101.  The 27-point
> difference in favor of her Verbal IQ [over
> her Performance IQ score] is statistically
> significant and rare, occurring in only 3.1%
> of the normative population.  It is
> suggestive of a nonverbal learning
> disability.

In summarizing her findings, Cucinotta stated that A.G.'s
"achievement in reading and math is significantly lower than her
verbal ability would predict and should be addressed through

---

5.  It is undisputed that A.G.'s parents received a Procedural
Safeguards Notice from LMSD on multiple occasions while A.G. was
an LMSD special education student.  The frequency with which
A.G.'s parents received such notices is disputed.

specially designed instruction to insure access to the basic curriculum."  The report concluded that A.G. has a "[l]earning disability in reading and math" and a secondary disability requiring "Speech and Language Therapy."

On January 19, 2003, A.G.'s mother, Cucinotta, and other LMSD employees attended a meeting to discuss Cucinotta's report and A.G.'s educational needs.  Cucinotta did not provide A.G.'s mother with a written definition of the term "specific learning disability."  A.G.'s mother signed Cucinotta's Evaluation Report and placed a check mark next to her name indicating she agreed with the recommendations contained in the report.  On February 3, 2003, A.G.'s mother approved LMSD's proposal to provide A.G. with "Resource Room Learning Support" and "continued Speech and Language support."

Thereafter, A.G.'s mother attended Individualized Educational Program ("IEP") meetings, in which she discussed A.G.'s special education needs with LMSD personnel.  She was free to express her opinions about A.G.'s educational needs at such meetings.

The LMSD middle school that A.G. attended consisted of sixth, seventh, and eighth grades.  One component of A.G.'s special education curriculum in middle school was Instructional Support Lab ("ISL").  In ISL, special education teachers worked with A.G. to provide additional instruction in various academic disciplines.  Because of the times at which ISL was scheduled, students in special education at A.G.'s middle school did not

take classes in certain subject areas every year.  Some special
education students were unable to take science or social studies,
but the subject a particular student missed to accommodate ISL
classes typically changed from year to year.[6]  A.G. took science
in seventh grade and social studies in eighth grade.  She did not
take history during any of her three years in middle school.  In
December 2005, when A.G. was in seventh grade, her mother agreed
with the school district's conclusion that it was unnecessary to
reevaluate A.G.'s special education needs.

In high school, A.G. was a member of LMSD's soccer,
basketball, track, and lacrosse teams.  A.G. selected her classes
on her own, but her choices were monitored by guidance counselors
to ensure that A.G. had room in her schedule for ISL classes.
While A.G. received credit towards graduation for ISL classes,
these classes were not used in computing her grade point average.
Because A.G. was required to take a certain number of ISL
classes, she was unable to participate in a ceramics class.  She
also was unable to take a child development class in ninth grade
and enrolled in that class in tenth grade instead.  As a senior,
A.G. took honors courses in U.S. Government and Psychology.

As a high school student, A.G. was allowed to
participate in the IEP meetings regarding her special education.

---

6.  For example in Durrell v. Lower Merion School District, the
LMSD student, S.H., missed science class throughout middle school
and also missed one year of Spanish.  Durrell v. Lower Merion
Sch. Dist., No. 10-6070, 2012 U.S. Dist. LEXIS 101048, at *9
(E.D. Pa. July 19, 2012).

Like her mother, A.G. had the opportunity to express her opinions
about her educational program.

In November 2007, when A.G. was in ninth grade, her
mother granted LMSD permission to reevaluate A.G.'s special
education needs.  LMSD psychologist Dr. Craig Cosden evaluated
A.G. and presented his findings in a report dated February 21,
2008.  As part of his evaluation, Cosden spoke to A.G.'s mother
about her daughter's performance on homework assignments at home.
A.G.'s mother stated that A.G. could focus on homework for 30 to
60 minutes at a time.  Cosden reviewed the grades A.G. earned in
eighth grade and grades earned to date in ninth grade.  Cosden
noted that A.G. scored in the lowest 1 percent of students taking
the Degrees of Reading Power Test in ninth grade, significantly
lower than her scores on that test in seventh and eighth grades.
Cosden concluded that the lower ninth grade score demonstrated
that A.G. "did not devote sufficient attention to the test as
there is no reason to believe her reading skills declined so
significantly in the past year."  The report detailed instances
during each month of the ninth-grade school year in which A.G.
had acted inappropriately or disruptively in class.  Cosden
observed A.G.'s behavior in a Spanish class.  He recorded his
observations in the report as well as the observations about
A.G.'s performance supplied by A.G.'s other teachers.  Cosden did
not request or receive any medical records to review.

Based on the recommendation of A.G.'s IEP team, Cosden
administered the Wechsler Intelligence Scale for Children - IV

("WISC-IV"), which "measures a child's verbal comprehension, perceptual reasoning, working memory, processing speed, and full-scale intelligence quotient ('IQ')." Durrell, 2012 U.S. Dist. LEXIS 101048 at *4-*5.  A.G. received predominantly average or below average scores on the WISC-IV.  A.G. also took the Wechsler Individual Achievement Test - II, a test that "assesses a student's achievement in three composite areas, reading, mathematics, and written language, and seven subtest areas, including word reading, reading comprehension, pseudo-word decoding, numerical operations, math reasoning, spelling, and written expression." Id. at *5.  A.G. earned average or above average marks in every category on that test.  Cosden administered the Behavior Assessment System for Children, which measures, in Cosden's words, "social and emotional functioning." Cosden found that A.G. "endorsed items related to needing to pay more attention, having a short attention span, giving up easily, and forgetting things.  At the same time, she also responded 'False' to the item, 'I have attention problems,' suggesting that she does not fully accept that focusing is an issue for her."

On a different test measuring skills related to learning, however, A.G.'s responses indicated that she had "difficulties attending to lectures and other academic tasks, monitoring and adjusting attention to performance, concentrating

and avoiding distractions" that were "no more problematic than for most students."[7]

Based on his evaluation, Cosden found that A.G.'s academic performance was now "commensurate with her cognitive ability." Nevertheless, in the summary of his findings, Cosden wrote:

> [AG] remains eligible for special education services. Her disability category should be changed to Other health Impairment to reflect problems with focusing and difficulty controlling her emotions. Problems with focusing attention and controlling her emotional reactions to perceived threats to her self-image have a significant impact on her academic performance. [AG]'s parents may want to share the results of this evaluation with her pediatrician to discuss treatment options for managing her inattentiveness. [AG] will need goals for completing academic work in a timely manner, organization and independent learner skills, focusing, building confidence in her academic skills, and controlling negative behaviors in the classroom.

---

7.  During his deposition, Cosden testified that he did not alter his evaluation of A.G.'s scores on these standardized tests even though he knew there existed a risk that A.G. would not have had science or social studies in middle school. Cosden conceded that "a few areas" of the intelligence tests address material that would be covered in "sixth or seventh grade science or social studies." As noted above, A.G. took science in seventh grade and social studies in eighth grade. It is also undisputed that prior to this litigation Cosden and Cucinotta destroyed the "testing protocols" for all tests they administered to A.G. without providing notice to A.G. or her parents. Although the record in this case is silent on the subject, in another case, Cosden described the protocols as "'the paperwork itself that tests are printed on or answers are recorded on' which are 'published by the test manufacturer.'" <u>Durrell</u>, 2012 U.S. Dist. LEXIS 101048 at *10-*11.

Cosden testified in his deposition that he suspected A.G. had attention deficit hyperactivity disorder ("ADHD") but was unable to diagnose her as having that condition with the information available to him.  He also testified that although he "did not have a label" for A.G.'s behaviors, it was his opinion that A.G. had an "other health impairment" that qualified her for special educational services.  Both of A.G.'s parents signed Cosden's report on April 28, 2008.  They placed check marks next to their names indicating that they agreed with the report.

On September 16, 2008, when A.G. was in tenth grade, A.G.'s mother approved a reduction in the number of ISL classes that A.G. would take as a part of her curriculum.  In January 2009, A.G.'s IEP team met and recommended a further reduction in the number of A.G.'s ISL classes and that this reduction be made without reevaluation.  On January 14, 2009, A.G.'s mother signed a form waiving reevaluation of A.G.  The form stated that she may request a reevaluation in the future.

In late 2010 and early 2011, the middle of A.G.'s senior year, A.G.'s father began having doubts about the nature of his daughter's learning disability and her need for special education.  He filed a due process complaint in which he sought to have A.G. removed from the special education curriculum. Then, in January 2011, at the beginning of A.G.'s final semester of high school, he requested that LMSD pay for A.G. to undergo an "independent educational evaluation" ("IEE") by a professional unaffiliated with LMSD.  At approximately the same time that he

-12-

requested the IEE, LMSD proposed to remove A.G. from the special education curriculum entirely.  Despite requesting exactly that result, A.G.'s father did not approve the school district's proposal but stated instead that a hearing officer should decide whether A.G. continued to need special education classes.  The parties subsequently participated in two due process hearings with respect to the concerns of A.G.'s parents concerning her special education curriculum, the results of which are not relevant for present purposes.  From the record before us, it appears that A.G. continued to receive special education until she graduated from LMSD in June 2011.

A.G. applied to five colleges and was accepted to one of them.  She was unable to attend that college due to financial concerns.  A.G. matriculated instead at Montgomery County Community College where she plays soccer and is pursuing a career in physical therapy.

In August 2011, A.G. and her parents initiated this lawsuit alleging that A.G. was discriminated against because she was "regarded as" disabled by the School District in violation of § 504 and the ADA.  Among other things, A.G. alleges that African-American LMSD students were disproportionately identified as requiring special education while she was a student.  The evidence in the record before the court is that over some unidentified period in the past, three successive supervisors in LMSD's special education program, Larry Sweigert, Dr. Michael Kelly, and Dr. Barbara Shapiro, were aware that the percentage of

African-American students in special education was higher than
the percentage of such students in the student population.
During their respective tenures, Sweigert, Kelly, and Shapiro
discussed this issue with LMSD's school psychologists, including
Cucinotta.  In response to these discussions, Cucinotta asked
Sweigert to identify what aspect of her testing practices was
faulty, but Sweigert declined to do so.  In approximately 2003 or
2004, Shapiro "brought in various specialists" to "fine-tune" the
practices used to identify students as having learning
disabilities.  These specialists offered LMSD school
psychologists training but did not review or observe any
disability testing performed by the school.  The subjects
discussed by the specialists in these training sessions are not
contained in the record, and Shapiro was not asked about this
training in the excerpts of her deposition that are before the
court.

III.

            Like <u>Durrell</u>, this case involves the uncommon
circumstance in which a student is claiming that she was
"incorrectly identified as disabled and discriminated against on
that basis, in violation of the ADA and the Rehabilitation Act."
<u>Durrell</u>, 2012 U.S. Dist. LEXIS 101048 at *17.  A.G. asserts that
LMSD denied her the benefit of the free appropriate public
education to which she was entitled under the Individuals with
Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.,

-14-

because it perceived her as having a learning disability when, in her view, she did not.

Generally, the IDEA requires that a state provide all children with disabilities a free appropriate public education. 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. 300.101; see P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 729 (3d Cir. 2009).[8] Schools meet this obligation by evaluating the needs of their students for special education and then "by designing and implementing an individualized instructional program set forth in an Individualized Education Plan ('IEP'), which 'must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" P.P., 585 F.3d at 729-30 (quoting Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004)). "[W]hile an IEP need not maximize the potential of a disabled student, it must provide 'meaningful' access to education and confer 'some educational benefit' upon the child for whom it is

---

8.  A child is disabled within the meaning of the IDEA if the child suffers from
          mental retardation, a hearing impairment
          (including deafness), a speech or language
          impairment, a visual impairment (including
          blindness), a serious emotional disturbance
          (referred to in this part as "emotional
          disturbance"), an orthopedic impairment,
          autism, traumatic brain injury, **an other
          health impairment, a specific learning
          disability**, deaf-blindness, or multiple
          disabilities, and who, by reason thereof,
          needs special education and related services.
34 C.F.R. 300.8(a)(1) (emphasis supplied).

designed.  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d

Cir. 1999) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176 (1982))

(internal citations omitted), superseded by statute on other

grounds, P.P., 585 F.3d at 730.

Similarly, § 504 of the Rehabilitation Act forbids

schools from discriminating against students on the basis of a

disability.  It provides:

> No otherwise qualified individual with a
> disability in the United States ... shall,
> solely by reason of her or his disability, be
> excluded from the participation in, be denied
> the benefits of, or be subjected to
> discrimination under any program or activity
> receiving Federal financial assistance.

29 U.S.C. § 794(a).  Our Court of Appeals has explained that

there exist

> few differences, if any, between IDEA's
> affirmative duty [to provide a free
> appropriate public education] and § 504's
> negative prohibition.  Indeed, the
> regulations implementing § 504 adopt the IDEA
> language, requiring that schools which
> receive or benefit from federal financial
> assistance "shall provide a free appropriate
> public education to each qualified
> handicapped person who is in the recipient's
> jurisdiction."

W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995) (quoting 34

C.F.R. 104.33(a)), overruled on other grounds by A.W. v. Jersey

City Pub. Sch., 486 F.3d 791 (3d Cir. 2007).

The ADA, in language similar to that in § 504 of the

Rehabilitation Act, states:  "no qualified individual with a

disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services,

-16-

programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

A.G. has brought claims against LMSD under the Rehabilitation Act and the ADA, but not under the IDEA.  The standards governing A.G.'s Rehabilitation Act and ADA claims are the same.  See Chambers v. Sch. Dist. of Phila., 587 F.3d 176, 189 (3d Cir. 2009).  To prevail, A.G. must demonstrate that she: (1) has a disability; (2) "was otherwise qualified to participate in a school program;" and (3) "was denied the benefits of the program or was otherwise subject to discrimination because of her disability."[9]  Id.  The definition of disability under both the Rehabilitation Act and the ADA includes not only an individual who is actually disabled but also anyone who is "regarded as" having a disability.  42 U.S.C. § 12102(1)(C); 28 U.S.C. § 705(2)(B).

There is no dispute that A.G. was regarded as disabled by LMSD and that she was otherwise qualified to participate in school activities.  Thus, the sole issue before us is whether A.G. has put forth sufficient evidence to raise a genuine dispute of material fact that she was denied the benefits of a school program or was subjected to discrimination on the basis of her perceived disability.  See Chambers, 587 F.3d at 189.

---

9.  Under the Rehabilitation Act, a plaintiff must also establish that the school district received federal funds.  See Centennial Sch. Dist. v. Phil L., 799 F. Supp. 2d 473, 481 (E.D. Pa. 2001). This element is not in dispute.

The Supreme Court has made clear that the remedies available under the ADA and the Rehabilitation Act "are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964." Barnes v. Gorman, 536 U.S. 181, 185 (2002).  Under Title VI, a plaintiff may not recover compensatory damages absent proof of intentional discrimination.  See Alexander v. Sandoval, 532 U.S. 275, 282-83 (2001).  In a recent case, we explained that a plaintiff must adduce some "evidence of intent, such as bad faith, gross misjudgment, or deliberate indifference, to sustain a claim for compensatory damages" under the Rehabilitation Act and the ADA. Durrell, 2012 U.S. Dist. LEXIS 101048 at *16-*17; see also Chambers v. Sch. Dist. of Phila., 827 F. Supp. 2d 409, 422-24 (E.D. Pa. 2011); see also Brown ex rel. R.P. v. Sch. Dist. of Phila., No. 11-6019, 2012 U.S. Dist. LEXIS 104855, at *22-*23 (E.D. Pa. July 26, 2012); David G. v. Council Rock Sch. Dist., No. 06-1523, 2012 U.S. Dist. LEXIS 51427, at *10-*11 (E.D. Pa. Apr. 12, 2012); Chambers, 827 F. Supp. 2d 425.  Thus, to defeat the motion of LMSD for summary judgment, A.G. must come forward with evidence from which a jury could find that LMSD acted with bad faith, gross misjudgment, or deliberate indifference to her right to receive a free appropriate education on the basis of a perceived disability.

Courts have explained that "[d]eliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the

-18-

likelihood." Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001) (citing City of Canton v. Harris, 489 U.S. 378, 389 (1988)); see Chambers, 827 F. Supp. 2d at 425 (citing Duvall). "[T]he 'knowledge' element is satisfied where the public entity has notice of the plaintiff's need for accommodation, and the 'failure to act' element is satisfied by conduct that is 'more than negligent, and involves an element of deliberateness.'" Chambers, 827 F. Supp. 2d at 425 (quoting Duvall). Gross misjudgment requires a showing that the defendant "depart[ed] grossly from accepted standards among educational professionals" or engaged in "a substantial departure from accepted professional judgment, practice, or standards." Monahan v. Nebraska, 687 F.2d 1164, 1171 (8th Cir. 1982). The parties have not cited and the court has not found a case articulating more precisely the meaning of "bad faith" in the context of a Rehabilitation Act or ADA claim, but the courts that have applied that term agree that a negligent violation of the IDEA does not constitute bad faith. See, e.g., id.; Williams v. Dist. of Columbia, 771 F. Supp. 2d 29, 31-32 (D.D.C. 2011); Charlotte-Mecklenburg Bd. of Educ. v. B.H., No. 07-189, 2008 U.S. Dist. LEXIS 83347, at *18-*25 (W.D.N.C. Sept. 24, 2008).

Plaintiff has failed to adduce any evidence that LMSD knew of a substantial likelihood that it was impinging A.G.'s right to a free appropriate public education. There is simply no evidence that prior to the spring semester of A.G.'s senior year, anyone at LMSD knew, should have known, or even had cause to

-19-

suspect that A.G. had wrongfully been identified as having a learning disability.  See L.T. v. Mansfield Twp. Sch. Dist., No. 04-1381, 2009 U.S. Dist. LEXIS 21737, at *21-*22, *28-*29 (D.N.J. Mar. 17, 2009).  Indeed, soon after A.G.'s father requested that LMSD remove her from special education, LMSD proposed to do so but A.G.'s father rejected this proposal.

A.G. argues that the knowledge prong of the deliberate indifference standard is satisfied because the LMSD administrators responsible for the district's special education program were aware that African-American students were over-represented in the district's special education program in comparison to its general student population.  As noted above, the record reflects that over an unknown period of time, these administrators discussed the issue with the district's school psychologists.[10]  The record does not contain any evidence of the percentage of students in LMSD's special education program or regular curriculum that were African-American or biracial during the relevant time period.  That school administrators discussed at an unknown time a statistical discrepancy of unknown magnitude does not create a substantial likelihood that A.G. was wrongfully

---

10.  In her brief, A.G. states that the discussions among LMSD administrators concerning the over-identification of African-American children as having special learning disabilities occurred between 1989 and 2012.  In her response to LMSD's statement of undisputed facts, she states these discussions occurred between 1987 and 2012.  Neither date range is supported by evidence in the record.

identified as having a learning disability.  See Chambers, 827 F. Supp. 2d at 425.

Even assuming, however, that LMSD was on notice that A.G. may have been incorrectly identified as requiring special education, there is no evidence in the record that could support an inference that LMSD acted with anything approaching bad faith, gross misjudgment, or deliberate indifference.  A.G. first asserts that she was placed into special education without an evaluation conducted in accordance with federal law.  The IDEA requires schools to perform a "full and individual initial evaluation" before placing a student into special education.  20 U.S.C. § 1414(a)(1)(A).  In 2001, the IDEA required LMSD to test A.G. "in all areas of suspected disability" using "a variety of assessment tools and strategies to gather relevant functional and developmental information, including information provided by the parent, that may assist in determining whether the child is a child with a disability."  20 U.S.C. §§ 1414(b)(2)(A), (b)(3)(C) (2001).

A.G. does not contend that she did not actually require speech therapy.  She argues instead that the evaluation LMSD made before providing speech therapy, a component of LMSD's special education curriculum, was not appropriate because the person who referred her for speech therapy did not complete every section of LMSD's Comprehensive Evaluation Report form.  This argument is without merit.  Before placing A.G. in speech therapy, LMSD personnel consulted with A.G.'s mother about A.G.'s speech,

observed improper pronunciations in the classroom, and
administered a standardized assessment of A.G.'s speech, the
Arizona Articulation Proficiency Scale.  A.G. has not explained
why LMSD was required to administer the WISC-III, an intelligence
test, or to complete every section of the report form, before
determining A.G. needed assistance pronouncing certain consonant
combinations.  LMSD's actions in placing A.G. into speech therapy
do not support an inference that it acted with bad faith, gross
misjudgment, or deliberate indifference.

      A.G. next argues that LMSD incorrectly determined that
she had a specific learning disability when she was in fourth
grade.  In 2003, when LMSD determined A.G. had a "specific
learning disability," the IDEA defined that term as "a disorder
in one or more of the basic psychological processes involved in
understanding or in using language, spoken or written, which
disorder may manifest itself in imperfect ability to listen,
think, speak, read, write, spell, or do mathematical
calculations."  20 U.S.C. § 1401(26)(A) (2003).  Federal
regulations permitted a student's IEP team to determine that the
student had a specific learning disability if:

>   (1) The child does not achieve
> commensurate with his or her age and ability
> levels in one or more of the areas listed in
> paragraph (a)(2) of this section, if provided
> with learning experiences appropriate for the
> child's age and ability levels; and
>   (2) The team finds that a child has a
> severe discrepancy between achievement and
> intellectual ability in one or more of the
> following areas:
> (i)  Oral expression.

```
            (ii)  Listening comprehension.
            (iii) Written expression.
            (iv)  Basic reading skill.
            (v)   Reading comprehension.
            (vi)  Mathematics calculation.
            (vii) Mathematics reasoning.
```

34 C.F.R. §§ 300.541(a)(1)-(2) (2001).  The regulations also required that "At least one [IEP] team member other than the child's regular teacher shall observe the child's academic performance in the regular classroom setting." Id. at § 300.542(a).

A.G. asserts that she was improperly identified as having a specific learning disability because Cucinotta did not observe her in the classroom before preparing her report.  This argument fails for two reasons.  First, the regulation permitted the in-class observation to be performed by any member of the IEP team.  It did not require the classroom observations to be made by a school psychologist.  Second, Cucinotta's report contains a paragraph under the header "Current classroom-based assessments and observations and observations by teachers and related service providers."  Cucinotta testified that observations were made by other members of A.G.'s IEP team.  A.G. has produced no evidence to the contrary to support her position.

A.G. maintains that her identification as having a specific learning disability was flawed because Cucinotta "did not determine as she was supposed to which — if any — areas A.G. demonstrated a severe discrepancy between her ability and her academic achievement skills." (Br. in Supp. of Pl. Mot. for

-23-

Summ. J. at 15.)  Plaintiff has come forward with no evidence
that the method Cucinotta used in 2003 to determine that A.G. had
a specific learning disability was so unreasonable or inadequate
as to constitute bad faith, gross misjudgment, or deliberate
indifference.  See Monahan, 687 F.2d at 1171.  In fact, a "Review
of Records" produced by plaintiff's own expert, a certified
school psychologist, was equivocal about whether Cucinotta's
assessment was even incorrect.  That psychologist, Tawanna J.
Jones, stated in her report that "it is not clear that student
[A.G.] ever met the criteria for ... Specific Learning Disability
...."  Although Jones did not agree that A.G. had a specific
learning disability, she conceded that "it could be argued that
A.G. meets part of the criteria for [specific learning
disability]."[11]  No aspect of LMSD's evaluation of A.G. in 2002
and 2003 supports a finding that the district acted with bad
faith, gross misjudgment, or deliberate indifference.

A.G.'s critique of Cosden's 2008 evaluation suffers
from the same defect.  She asserts that Cosden improperly

11.  As noted above, Cucinotta classified A.G. as having a
specific learning disability by comparing her Verbal I.Q. score
to her Performance I.Q. score on the WISC-III test.  A.G. argues
that such a comparison is not the preferred method for
identifying specific learning disabilities in African-American
children.  She reaches this conclusion based on the work of a
scholar named Jerome Sattler.  Although she did include as an
exhibit a page that appears to come from a book written by
Sattler, A.G. has not introduced a declaration from Sattler or
any evidence that his work is generally accepted by those in the
relevant field.  In fact, when questioned about Sattler's work,
Cucinotta stated that she was unaware of it.  There is no
evidentiary basis in the record for us to consider this argument.

diagnosed her as having an "Other Health Impairment" even though,
in her view, she did not meet the statutory definition of that
term.  In 2008, federal regulations defined that phrase as
follows:

> Other health impairment means having
> limited strength, vitality, or alertness,
> including a heightened alertness to
> environmental stimuli, that results in
> limited alertness with respect to the
> educational environment, that—
>     (i) Is due to chronic or acute health
> problems such as asthma, attention deficit
> disorder or attention deficit hyperactivity
> disorder, diabetes, epilepsy, a heart
> condition, hemophilia, lead poisoning,
> leukemia, nephritis, rheumatic fever, sickle
> cell anemia, and Tourette syndrome; and
>     (ii) Adversely affects a child's
> educational performance.

34 C.F.R. § 300.8(c)(9) (2008).  It is undisputed that at the
time of Cosden's evaluation, A.G. had not been diagnosed with any
medical condition.[12]  As noted above, Cosden testified that he
believed A.G. had ADHD but that he lacked sufficient information
to diagnose that condition.[13]  Nevertheless, it was his opinion
that A.G. had "problems with focusing and difficulty controlling
her emotions."  He changed A.G.'s disability classification from
"specific learning disability" to "other health impairment"

---

12.  A.G. assumes that the phrase "chronic or acute health
problems" encompasses only diagnosable conditions.  LMSD's
expert, a professor in the department of psychiatry at Drexel
University, asserts that the phrase is not limited only to
diagnosed medical conditions.

13.  A.G. has submitted the report of a clinical psychologist who
is of the opinion that A.G. does not have ADHD and did not have
ADHD in 2008 or at any other time.

because he "did not have a label" for the behavioral issues he
observed.

Drawing all inferences in A.G.'s favor, Cosden
classified A.G.'s observed behavioral and emotional issues as an
"other health impairment" in technical noncompliance with the
IDEA definition.  No jury could determine from this, however,
that Cosden's conduct amounted to bad faith, gross misjudgment,
or  deliberate indifference.  As explained above, Cosden
thoroughly documented in his evaluation report the facts that led
him to believe that A.G. continued to require special education
services.  Even if his decision to classify A.G.'s behaviors as
an "other health impairment" was incorrect, that simply is not
actionable under the Rehabilitation Act or the ADA.  See Durrell,
2012 U.S. Dist. LEXIS 101048 at *21-*24; L.T., 2009 U.S. Dist.
LEXIS 21737 at *21-*22, *28-*29; see also Sellers v. Sch. Bd. of
the City of Manassas, 141 F.3d 524, 528-29 (4th Cir. 1998).  In
sum, plaintiff has not adduced any evidence from which a jury
could find that Cosden's evaluation of A.G. amounted to bad
faith, gross misjudgment, or deliberate indifference on the part
of LMSD.  See Sellers, 141 F.3d at 528-29; Monahan, 687 F.2d at
1171; Durrell, 2012 U.S. Dist. LEXIS 101048 at *21-*24; L.T.,
2009 U.S. Dist. LEXIS 21737, at *21-*22, *28-*29.

A.G. next asserts that LMSD violated the Rehabilitation
Act and the ADA by excluding her from "core curriculum classes."
Her two primary allegations here are that LMSD discriminated
against her on the basis of a perceived disability by placing her

-26-

in ISL, which prevented her from taking ceramics in high school and from taking history in middle school, and by not counting ISL classes toward her grade point average.  We conclude here, as we did in <u>Durrell</u>, that "[n]one of this is evidence that can reasonably be viewed as intentional discrimination against [A.G.] because the School District regarded her as disabled."  <u>Durrell</u>, 2012 U.S. Dist. LEXIS 101048 at *22.

Finally, A.G. claims that her parents were denied the information necessary to give informed consent to LMSD's proposals concerning the special education services to be provided her.  She objects that LMSD did not explain to her parents that speech therapy was a component of LMSD's special education curriculum or that ISL courses in high school were not included in her grade point average.  She further objects that LMSD did not provide her parents with written definitions of the terms "specific learning disability" and "other health impairment" when it classified her as having those conditions. A.G. also maintains that LMSD did not explicitly tell her parents that they could withdraw A.G. from special education.[14]  It is undisputed, however, that A.G.'s parents received numerous Procedural Safeguards Notices from LMSD during the course of

14.  Additionally, A.G. contends that her mother was not informed that A.G. would be unable to take science, social studies, or a foreign language in middle school as a result of the ISL courses. The point of this contention is unclear because she did actually take classes in these subjects.  A.G.'s middle school transcript reflects that she took Spanish in sixth grade, science in seventh grade, and social studies in eighth grade.

A.G.'s participation in special education and that they approved of every action proposed by LMSD with respect to their daughter's special education prior to the last semester of her senior year in high school.  A.G.'s mother attended IEP meetings at which she participated alongside LMSD personnel.  No fact-finder could determine from the undisputed facts concerning the notice given to A.G.'s parents that LMSD acted with bad faith, gross misjudgment, or deliberate indifference to any right A.G. had under IDEA.

In light of the record before the court, there is no disputed issue of material fact with respect to A.G.'s ADA claim or her claim under § 504 of the Rehabilitation Act.  LMSD is entitled to judgment as a matter of law.  The motion of LMSD for summary judgment will be granted, and the motion of A.G. for summary judgment will be denied.